[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMEORANDUM RE: MOTION TO MODIFY CUSTODY
The parties were divorced on January 9, 1991. The parties are the parents of three children, who are now 19, 14, and 11. The middle child is a male and the oldest and youngest, female. At the time of the judgment, the parties executed a Separation Agreement which detailed joint custody, primary residence with the mother, and a specific access schedule for father. The judgment was modified on January 21, 1997 at the Regional Family Trial Docket. That agreement called for the children to continue to live with their mother, and spend alternating Thursday nights with father, and alternating weekends from Thursday until Monday morning before school. They adopted a curbside pick-up and drop-off during the summer months, a holiday and summer schedule, and each agreed to a permanent restraining order with respect to entering the property of the other. The children were to recommence therapy.
On February 25, 1998, the plaintiff filed a Motion to Modify Custody. He claims a substantial change in circumstances. Family Services conducted an evaluation, marked as Plaintiff's Exhibit 1 in this proceeding. The children are represented by counsel, and a guardian ad litem. In April, the defendant filed four motions addressing child support and health-related matters, including reimbursement for previous services. Their agreement at the Regional Family Trial Docket included a requirement that financial information be mutually disclosed by January 30, 1998.
This is a textbook high conflict custody case, where the two CT Page 2268 remaining children of the parents are the subject of constant maladjustment to the dissolution process by their parents. The minutia of the parents complaints concerning the other at this stage of the proceedings were pathetic. Their involvement with the Regional Family Trial Docket was not productive of change for them. Their multiple motions, and earlier allegations of sexual abuse, physical abuse within the marital relationship, emotional abuse, and claims of subversion of the father child relationship track the most compelling and difficult cases which come before the court in family matters. The court cannot resurrect the lives of these children, and the demeanor or the parties and at least one of their spouses in the courtroom proved their complete unwillingness to hear each others' concerns and work toward collaboration or resolution. These children are being emotionally abused on a continuum by their parents.
Donna Sauer conducted the evaluation for this family. She is a Family Services Counselor attached to the New Britain office. Her report recommends that the children live primarily with their father. The oldest child, now in her legal majority, resides at the University of Rhode Island, but provided information to the evaluator. She has no current relationship with her father, and fears a loss of relationship with her younger siblings should they live primarily with the father. The mother indicated that she would terminate her relationship with the children should they elect, and be ordered to live primarily with the father. In cross-examination, she agreed that she made those assertions, but only in frustration, and certainly did not mean them. She claims that she has always been there for her children, and would continue to be.
While the youngest child has made allegations of inappropriate contact by her father the past, it does not affect her ability to share a productive relationship with her father at this time. Father argues that the allegation was unsubstantiated and comes from the continuing vendetta being waged against him by the mother using the children against him. The mother claims that the father has never had the day to day responsibility of raising the children and is incapable of raising them. Mother expressed concern that the male child had told her that father allowed him to play Nintendo rather than finishing homework. While counsel objected to the questions surrounding these old allegations, along with allegations of family violence perpetrated against the defendant by the plaintiff, claiming that they had been instructed by Judge Steinberg at the Regional Family Trial Docket CT Page 2269 that these allegations were history and should not be brought up again, it is clear that the parties have not given up any of the old conflict, and exacerbate that conflict by their commitment to that conflict. They simply are refusing to give up their old dysfunction, to truly divorce their adult relationship, and more appropriately parent their children. They will not give up their wounds to focus on the needs of their children for appropriate parenting. The children's perceptions were addressed in the report. The children articulated to the evaluator that they were more comfortable in their father's home, and that it was not as tense as their mother's. They complained that there was drinking in their mother's home, and the son especially did not appreciate his stepfather's assumption that he could "discipline" him in ways that the stepfather selected.
The witness did discuss the possibility of changing schools with the children, and she indicated that they were accepting of that. She obtained records from the children's school, insofar as school was not in session at the time. The records disclosed that the parents had attended some PPT meetings up to 4/17/98. She also spoke to both parents about their involvement. The parents confirmed that they attended meetings which were scheduled, and neither parent expressed a complaint about the other with respect to school involvement.
The witness did not discuss religious practices or instruction in West Hartford, nor did she inquire as to special activities other than sports activities which might have been specific to the school environment.
The mother's therapist was contacted and expressed some concern about what as contained in the report of Family Services. On voir dire by the attorney for the child, which was not objected to, the witness indicated that her follow-up conversation with the therapist did not change her opinion with respect to what is in the best interests of the children currently. The witness agreed that it would be devastating for a custodial parent if the children expressed a desire to move to the other parent's home.
The witness recalled conferring with "Uncle Eddie" Bogdan. He is the maternal uncle of the children, and has an especially close relationship with the male child. He indicated that he would not be able to conduct his relationship with the child, because he feared that the father would be defensive concerning CT Page 2270 that relationship. The male child minimized how difficult his life might be without a relationship with his mother, as threatened by the mother and stepfather, if he went to live with his father. The testimony was unclear that the relationship with his Uncle Ed might also suffer from his relocation to his father's house.
The attorney for the minor children presented two reports of the separate PPT meetings conducted with the parents individually. Apparently their conflict over-taxes other public institutions as well. The reports indicate that the child was diagnosed as L.D., not ADHD.
The plaintiff called his current wife. She is an associate professor at a regional community technical college, and is trained in secondary education and administration. She described the time the children currently reside with the father. She described her relationship with the male child as close and getting closer, and that it is loving. She claimed that she is supportive of the relationship he has with his mom and stepfather. Her relationship with the female child is not as close as that of the male child. The report of Family Relations indicates that the children have a solid and comfortable relationship with her. She described the male child's complaints about his stepfather, and the negative comments concerning father and stepmother. She described the female child as complaining about the loud arguments between mom and stepfather. She claims that she has had a developing and good relationship with the children which the court finds credible.
On cross-examination, the witness testified that the counseling with Dr. Ellovich began shortly after the evaluation was completed and after the court order of January, 1997. She claimed that the children wanted to see Dr. Ellovich because they were comfortable with him. She claimed their father called the attorney for the minor children to disclose that and informed him of that choice. Apparently, that information was not conveyed to the mother. The father and stepmother counseled in the winter of 1997 with Dr. Hall. The counseling with Dr. Ellovich was every six (6) weeks in group, shortly after they had commenced individual counseling. Their individual counseling took place for a short period of time.
On October 5, the father and his wife made an appointment with the male child's guidance counselor at Conard who indicated CT Page 2271 that he was doing alright. However, she claimed that they received a phone call indicating that he was having a fragmented week this week. When asked what the significant change in circumstances are since the last court order, stepmother replied that they have married and have a stable home life which supports the education of the children. She testified that the father and she would enroll them in extracurricular activities. Apparently, counsel for the children was informed of their desires to have these activities.
She claims that the children first expressed their desire to live in their father's home prior to January, 1997, but that the claims were more insistent and frequent lately. She claims that the motion to modify was filed by her husband so that the children will feel safe and secure, and so they can be more normal children. The wife is the primary financial provider for the family, and has provided medical insurance for the children since the father and she were married in 1997. She testified that if the mother ceased having a relationship with the children, she would adopt them. The court feels that this assertive position, coupled with her blind support of her husband is counterproductive to a resolution of the parenting problems between the parties to this action. She appears to the court to be intelligent and caring, and provides the children will additional adult support. In fact, her introduction into this family unit appears to have been a positive for the children, a positive they were in sore need of.
The husband of the mother seems to bring little to this equation, and his pronouncement of cutting off ties with these stepchildren, as he has done to his very own children, is nothing short of disturbing. He certainly does not appear to have a positive relationship with the children, and it may be the reason their request for a move has happened. The challenge to Ms. Sauer's testimony was not persuasive to this court, and it appears that the children were told that the mother and stepfather were pronouncing their decision to cut ties with the children if they articulated the desire to live with their father.
The plaintiff father testified. His concerns were basically educationally related, but he was also concerned about the way the male child told him that he was treated in his mother's home. He agreed that the parties had no communication, but that the attorney for the minor children had facilitated payments for CT Page 2272 sports activities etc. He claims that he has attempted to encourage the children in their relationship with their mother, but that their relationship has gotten worse over time. He testified that he stopped trying to call her over issues, because he would be contacted by the police with questions about harassment each time he attempted to make contact. He denied stalking or making harassing phone calls.
The plaintiff made a unilateral decision to return the children to Dr. Ellovich, but claimed that the mother had done the same thing before. The children went about every six (6) weeks, and then discontinued the treatment. The plaintiff testified that he did not ask what they had talked about in treatment because the children needed a safe place to talk about issues of concern to them. He testified that while he had hoped to have a better parenting relationship, and while it was better at some point post-dissolution, it went downhill about three years ago.
The plaintiff testified that he would have paid for the town soccer league, but the children have not been involved in sports, and it compromised the male child's ability to participate in the high school soccer team. Due to lack of experience, he was cut from the team. The plaintiff testified that the children will be kept in the West Hartford public schools. He claims that the children are just happier in his home, and their personalities are free, and there is no tension for them at his home. The children are appropriately disciplined in his home. He claims that he does not use corporal punishment as a means of discipline, unlike their stepfather.
On cross-examination, the plaintiff was asked when after the January, 1997 court order did he plan to ask for residential custody, to which he replied, in April of 1997. He claims that things were happening in the mother's house which made the children unhappy. He waited almost a year before making a motion, to ensure that it was a legitimate request of the children. He knew that their mother would be hurt by that, and they were asking for a major life change which should not be done precipitously. Needless to say, their agreement at the Regional Family Trial Docket was to deal with the situation during most of their minority, and that agreement fell apart almost immediately. The plaintiff resented the stepfather's reported treatment of the children. CT Page 2273
The plaintiff indicated that he did not agree to any testing for ADHD, and that he does not have that diagnosis. When asked if the male child was LD, he said the child had been mainstreamed in two classes. When the court interjected with Child's Exhibit 1 and 2, the witness relented that he guessed that the diagnosis of LD had in fact been made. On redirect, he testified that a PPT was held on November 10, 1998 for their son. He will be mainstreamed in all courses by January except for English. It appears that their son has in fact needed intervention. The plaintiff thereafter rested.
The defendant mother testified in her own case. The defendant is a teacher, teaching English for Speakers of Other Languages. Her schedule comports with the schedule of the children in school. She did not know that the children were so unhappy until she was served with the Motion to Modify in January, and thought that they were happy with the routine established in the Regional Family Trial Docket. The defendant was happy that they were finally out of court after an eight year struggle.
She testified that their son had not had a recurrence of the acting out behaviors which had earlier plagued him, and was able to adjust following her remarriage in 1994. He is currently labeled Learning Disabled, although he had been labeled socially emotionally maladjusted until the sixth grade. She testified that some of his problems are anxiety-related and that he has done better as his situation became more stabilized.
She has not made any motions to modify the custody and visitation orders of the court, RFTD, January, 1997. She claimed that the stepfather had not been allowed to discipline the children, but that he had intervened at one time in 1994 to escort Stephen to his room. She testified that she does not leave the child at home alone with his stepfather, and that the stepfather does not mistreat the child. She claimed that that one incident of out of control behavior was the only time that the child was handled physically by them.
She testified that he use of alcohol was limited to an occasional glass of wine, and that she does not recall being intoxicated. She also claimed that her current husband has never been intoxicated in her presence. Her last drink was such a long time ago that she could not recall when it was. The witness recalled the one call in the evening that she received from Dr. Elovich after an academic awards ceremony, where he claimed that CT Page 2274 her words were slurred. She denied that, and denied that she said negative things about the father in her home. She denied that her current husband criticized the father. She denied all of the allegations contained in the family division report, including the assertion that if the children went to live with their father that she and their stepfather would have nothing further to do with them. She testified that she was under the impression that her home was comfortable for them, that they did not express unwillingness to come home to her home after spending time with their father. She agreed that she had discussed the Family Division report with the children, and the fact that the parents were going back to court. She claimed that she was careful not to discuss the court action, and when asked, gave simple answers.
She described extra-curricular activities, and when Stephen was allowed to participate, depending on completion of homework, or other probationary periods. Kristin is accomplished, and active. She does not suffer the same deficits as does her brother.
She does not see any benefit to a change of residence of the children. She claimed that the children were doing well, and will not do well with their father. She has always done the "mother thing", and did not know whether or not their father would be able to do those things. She persisted in cross-examination in doubting his overall abilityto meet the day-to-day responsibilities for their children. This is despite her acceptance of the efforts the father has made in the recent months working with Stephen on homework and support in school.
On cross-examination, she denied that she could not be in the same room or location with her ex-husband. She also denied that the registration fee for recreational soccer was affordable, despite the fact that the fee was less than fifty dollars. She denied that Stephen wanted to play soccer, and said that the spring of eighth grade he wanted to do cross-country, then changed his mind for soccer, then expressed his interest in track. She testified that it was their father's insistence on soccer that drove that choice.
She agreed that Stephen had improved in the past year, although he is still a bit behind. She understands that Stephen has expressed a desire to live with his father and stepmother, and does not know about Kristin. She testified that Stephen had not told her that he wanted to live with father and stepmother. CT Page 2275 She feels that the child perceives that environment as a place to play Nintendo, and not do his homework. She agreed that it was her idea to do separate PPT meetings.
Since his remarriage, he has spent more time with the children. On cross-examination, she agreed that the children come home without transitional difficulty since June, of 1998. She agreed that Stephen began his progress at about that same time. Earlier, the children had difficulties when they arrived back at their mother's home from their father's home. It appears from the testimony that the relationship between the children and their stepmother is much more positive than their relationship with their stepfather. The defendant could not describe what she might feel is inappropriate about plaintiffs home, other than her home is and has been their home, where they have a support system, and their neighborhood and school environments. Clearly, the claims of the parties as contained in the Family Services report do not rise to the level of concern where an abuse or neglect petition would be appropriate, but encapsulate the incapacities of these parents to be real about their children or to understand the real needs of the children. The parents have created this morass for the children and have created an adverse world for them to live in. The parents of these children are responsible for making the lives of these children very unhappy, immature and anxiety-ridden, and are now reaping the damaged fruits of their labors.
In the last eight years, the parties have fought over issues of visitation, and she denied that the father had to fight for every bit of time he has secured with his children. When asked how many times she called the police alleging that the father was harassing her, she said several. She agreed during cross-examination that she did not inform the father when Stephen made a suicide gesture, nor when he ran away. These two adults are totally incapable of dealing with their problems. They have not had communication out of the court context in years. She claims that she needs boundaries imposed by court order because of his violence, his gun possession, and inappropriate behaviors vis a vis her personal safety. She claimed that she would do what she had to do for the best interests of the children. The court finds that neither parent is capable of putting the best interests of the children above their own needs to win the battle with each other. Their pathological incapacity is apparent, and the court wonders how any help can be afforded to these children by the court. The defendant relies on the specificity of the CT Page 2276 court order to give definition to their parenting. The plaintiff persists in encouraging his children to see the issues his way, and the male child has exhibited aggressive behavior which seems to demonstrate an education in violence in his home of origin. Certainly, the plaintiff bears the responsibility for that. The issues of sexually inappropriate behavior by father and female child are not resolved, but appear to have been ameliorated over time, and the female child has not been made a victim for all time by either parent.
The court finds that both parents lack credibility. If their respective testimony is to be believed by the court, they certainly would not be in this court, because they would have happy and well-adjusted children, and the children would be free to love and be with each of their parents. If their respective testimony were to be believed, none of the trauma perpetrated on these children would have occurred. They are both wrong, and unwilling to accept ANYTHING the other says. They cannot jointly parent, have not jointly parented since the original order, and the order is irrelevant to the real lives of these parents. They visibly and palpably hate each other. The court also finds that the mother refuses to give up her "victimization" by the plaintiff. While she claims she was the victim of family violence in their marital relationship, that marriage is over, but the defendant does not appear to the court to have moved past her victimization. That "status" for her may be important, but it has been helpful in the undermining of her relationship with her children. She has over time insisted that they take on the stress she continues to feel.
The defendant called her brother, Edward Bogdan, the maternal uncle who has a good relationship with Stephen and Kristin, most especially with Stephen. He sees the children once a week. Historically he has seen the children with their mother during holidays, and since his retirement about once per week. They spend time, talk, play golf, sail, work around the yard and the like. He recalled talking to Donna Sauer, and knew there was a custody evaluation going on. He remembered the general nature of the conversation, but did agree that he might not be able to share the same kind of time with Stephen if he lived with his father.
Mr. Bogdan gave some help to the parties and the plaintiff's bakery while the parties were married, and after the separation, he talked to the plaintiff on the phone. The plaintiff ranted and CT Page 2277 raved about how bad his sister was, and after he calmed the plaintiff down, little could be accomplished. Lawyers were involved with the parties, and tempers were abundantly displayed during those calls.
Mr. Bogdan described Stephen's conversations about his parents' conflict. The witness asked Stephen if he really wanted to pick a parent who he wanted to live with. He had spoken to the plaintiff about why they were wasting so much money on lawyers, and he offered to be the mediator to save them court time, and agony. The witness explained to Stephen that he wanted to be a sounding board for the children to help them through this problem. This conversation occurred at an ice cream parlor, where the child took two napkins, said this is mom and this is dad, and the ketchup bottle in the middle is me. Stephen e-mailed his uncle after expressing that he was feeling alot of anxiety that day, which day was a court day. After not wanting to talk about the conflict between his parents for a couple of visits, he visited on October 2, when he said maybe he wanted to live with his dad because his mom was going to put him on drugs. Stephen admitted that that was a concern of his father's, and later that day Stephen said his father said he would be really mad if he stayed with his mother but he would get over it. Stephen finally said he did not want to make a decision, but later wrote that he wanted more flexibility with spending time with his father.
The child clearly has articulated what children of divorce tell us; that they are sad that their parents are divorced, but they want to be able to have a loving and open relationship with each. These parents have prevented that.
On cross-examination, the witness agreed that he had been sounding board for both parties about their conflict with each other. Those conversations included their inability to work out access arrangements for the children. Stephen has not had a preference to live with either parent, and does not want to hurt either parent. The witness denied that his sister was inflexible. His focus has been the children. He has tried hard not to become overly involved with the adult conflict, but wants to be a resource for a trusting relationship with the children. He appears to be the adult that at least Stephen can talk to unconditionally. While the plaintiff argues that the child would respond to the witness as he would his mother, the witness appeared to be truly concerned for the welfare of the children. CT Page 2278
The defendant called her current husband John Truscio. He denied making an obscene gesture to the current Mrs. Winalski. He denied telling Donna Sauer that if the children lived with their father that he would not have any further relationship with them. He denied saying anything as quoted Ms. Sauer's report. He denied that he said he had to "cut bait" with his own children. On examination by the attorney for the minor children, the witness said he would welcome visits by the children into their home which he shares by virtue of his marriage to their mother.
As a result of this testimony, the court required the further testimony of Ms. Sauer. She testified out of turn, but reconfirmed the statement made by Mr. Truscio. The court finds that Mr. Truscio lacks credibility on the issue, and that helps to understand the observation of neutral witnesses that the children have a much better relationship with their stepmother than their stepfather.
The attorney for the minor children called the guardian ad litem to testify. She is an attorney admitted to the practice of law in the State of Connecticut. She was appointed in May of 1998. She testified as to her qualifications and specialized training in the area of family law and childhood development. Her knowledge of the case is limited to the recent past, and saw the children, read the family services report prior to the scheduled trial in August of 1998. After this matter was scheduled, she had the opportunity to read all of the previous evaluations and letters concerning this family. She has met with the parents and stepparents in her office, as couples, and reviewed school records and correspondence from the parties.
The children have made their preference known to the guardian ad litem. She did not ask them who they wanted to live with because she recognized the long term conflict between their parents. She reviewed the things they indicated to family services, and gleaned from them their preference to live with their father. They could not explain that with specificity. The children knew that a judge would make a decision about where they should live. Stephen said to her that it might be "weird" to live away from his mother's home, and what he really wanted was flexibility between his parents. He was clear that his mother would not allow that flexibility, and he asked whether or not Ms. Thomson thought that could happen. While she responded to him that she did not know, she did not want to admit to him that she sincerely doubted that these parents were capable of that kind of CT Page 2279 cooperation. They were consistent in both homes, however, that they wanted to live at their father's home, and they did believe their mother when she said she would no longer speak to them if they left her home. Her opinion is that the recommendation of the family services unit is in their best interests.
When he spoke to the GAL most recently, Stephen was at his father's home and expressed a preference to live there. The maintenance of close relationships with extended family members is important to the children's well-being. Stephen now wishes to remain in the West Hartford school system. It appears to the court that that is appropriate for the child. The GAL was highly critical of mother for not following the recommendations of the PPT to allow Stephen to have access to her computer. She referred to it as a form of neglect. She became aware of the father's low level of support for the children historically.
The GAL did not speak to Ms. Dooley with respect to the history of domestic violence, nor to the female child's school counselor. She read Mr. Lubin's report but did not speak to him further. She was asked what kind of flexibility Stephen was looking for, and she described it as being allowed to go where HE wanted to go between both parents. The GAL was told by Stephen that his father would let him have that flexibility, but his mother would not. He expressed that his mother would not see him if he went to live with his father. Dr. Ellovich acted as a "safe haven" rather than a therapist for the children. He was in favor of the move from the mother's home to the father's home.
The plaintiff called her therapist, Theresa Dooley. There had been a Motion in Limine insofar as there had been no disclosure of the witness as an expert witness in this matter. She is a M.S.W. Her qualifications were elicited for the court, and the witness is well-educated and has a great deal of experience in her field. She testified that she had one fifteen minute conversation with Donna Sauer. She testified concerning issues discussed with Ms. Sauer, and felt that Ms. Sauer "interpreted" her statements rather than reporting them. She also was upset that her recollection of a family session which she felt was manipulated by the father after her initial contact with him in 1990, when she wanted to help them formulate a parenting plan at the inception of the divorce process.
The witness' last contact with the mother was one week after the last court date in Middletown, and then yesterday. She had CT Page 2280 discontinued consistent treatment shortly after the divorce. Her information is helpful, and she clearly was helpful to the mother. It is unfortunate that the parties did not take up her suggestion that they meet to work through their parenting issues at the outset. Ms. Dooley might have been able to help the children especially, to avoid the parental warfare which has been at the center of their childhood.
Dawn Winalski was called to testify. She lives with her mother and stepfather when she is not at the University of Rhode Island. She has no relationship with her father. She participated in the Family study, and noted some things that she told Ms. Sauer had not been included. She was given the complete report to read by her mother, which was regrettable. The report details the long and tortured history of this dysfunctional parenting. It details the substance of the accusations each parent has made about the other, and it is unfortunate that she continues to be mired in this problem. Her testimony was a sad commentary concerning the difficulties which exist for children who grow up in highly conflicted homes.
The mother called Mrs. Maciel, her neighbor and friend. Their families have visited, and the children have played. They have frequent contact and there was a stipulation that she had never heard the mother bad mouth the father in the presence of the children. She testified that the stepfather has been appropriate with the boy children, even taking them camping. Her son is a friend of young Stephen, and has been in Mr. Truscio's company successfully many times. She characterized the relationship between the stepfather and the parties child as normal, and that the household is happy. Stephen has spent time in her house, and has not complained about his homes. She said that the boys play video golf and keep to themselves and are generally non-communicative.
The plaintiff claims that he has demonstrated a substantial change in circumstances, and that he has come to court to put into place the articulated preference of the children. The report of Family Services and the recommendation of the Guardian Ad Litem as argued by the Attorney for the Minor Children support the move of the children to the father's home.
The defendant claims that there has been no substantial change in circumstances, and that the articulated preference of the children is not dispositive of this matter. CT Page 2281
The court finds that a substantial change in circumstances has not been demonstrated, as to the adult issues presented herein. The stepmother may have married the plaintiff father, but she was part of father's family when the agreement was made in January of 1997 in the RFTD. The homes of the parties have not changed, and the attitudes of each are frozen in time and stone. In fact, this court finds that the father's decision to make the motion to modify so soon after the agreement at the RFTD belie his claim that he is only interested in the needs of the children. He has pursued his own form of vendetta, one of vindication, because of the earlier claims made against him. The defendant mother is unforgiving and rigid, and has selected a mate who is not willing or not able to assist her into a new life with him. It appears to the court that the children do prefer their stepmother over their stepfather.
The court does not leave its inquiry at the finding that there is no substantial change in circumstances as to the adult issues. The court finds that the children are in need of relief from this warfare within their family. The court finds that "the best interests of the children" must result in an order which meets the needs of the children, predicated on the facts of the case. In a matter of such conflict, the court does not have the option of giving the children more resilient and adjusted parents. The court can only chose between the two parents with which the children are saddled, because the abuse to these children does not reach the level of an Order of Temporary Custody to foster care, which would serve only to punish the children. The court does not believe that either parent has been interested in "the best interests of the children" in this case. They have been far too focused on their own needs.
But the children have some sense of what they need-flexibility. They both have told their attorney that they find that more in their father's home. The articulation of the children is to acknowledge that they are freer to express their need for their other parent in their father's home. This has occurred with more frequency in the recent past, and confirms to the court not only their frustration with their mothers rigidity, but also their frustration with their circumstances. The evidence indicates that the children want to stay in the West Hartford school system, and would like to stay at mom's house, if she could be flexible. The court agrees with the guardian ad litem that mother is not capable of flexibility when it comes to the CT Page 2282 plaintiff father.
The court finds that it is in the best interests of the children to make their primary home with their father, but orders that they maintain enrollment in the West Hartford school system. The parties will maintain the same access schedule as described in their agreement with the RFTD, reversed with the children visiting their mother, and shall continue to call custody "joint", even though they are not able to communicate with each other. The court further orders that the defendant shall pay the same level of child support to the plaintiff father, or Seventy-nine ($79.00) Dollars per week, by contingent wage withholding. This may deviate from the Uniform Support Guidelines, but the court finds that the plaintiff is allowing his wife to be the main support of his family, and that the stepmother willingly accepts that part of parenting. Furthermore, there has been found no adult change in circumstances, and the court does not feel that the children should be leverage in an ongoing financial battle between the parties.
The court further orders that the children shall be entitled to see their sister, and their maternal relatives at any time they desire. They may call their attorney to articulate this desire, but the court expects their parents to see to it that they have free association with those people in their lives with whom they have a happy, beneficial, and comfortable relationship. The court orders that the children, especially Stephen, maintain a consistent schedule with their uncle Ed Bogdan.
The court orders that the children be enrolled in counseling, and that the mother be involved. If the therapist wants the stepfather to be involved, then he also should participate.
The court orders that the orders in this opinion be read to the children in the hopes that they understand the limit of the court's power to help them find some happiness and balance in their lives. The court wants them to understand that they must work hard to maximize their potential, and to seek the help of a therapist to resolve how they feel and then move on to their future. They have had to deal with their parents' distrust of each other, but they do have parents who love them and want them to be happy. Their coming to court has made that almost impossible to show to the children. The court believes their mother when she says that her statements about not seeing the children if they went to live with their father were made in CT Page 2283 frustration and anger at their father, but that she would certainly want to spend as much time with them as possible if they lived with their father. The court hopes after her initial disappointment with this ruling, that time with mother will be often, and be happy .
The motion to modify is granted consistent with this opinion.
DRANGINIS, J.